**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | MISC. NO. |
| v. : | |
| : | **Filed Under Seal** |
| SIKIRAT ADUNNI BROWN, : | |
| : | |
| Defendant. : | |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

**I.    IDENTITY OF THE AFFIANT**

I, Kristina Benoit, being duly sworn, state:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"). From 2019 to the present, I have been assigned to a white-collar crime squad at the FBI's Washington Field Office in the District of Columbia, specifically focused on the investigation of health care fraud and other health care crimes. I have received training in general law enforcement and criminal investigations, and I have attended training programs focused on health care crimes. I have investigated allegations of health care fraud, false statements, identity theft, mail fraud, and wire fraud.

2. I am assigned to this investigation and my involvement has included, but is not limited to, interviewing witnesses, reviewing Medicaid billing claims and medical records associated with Medicaid recipients, as well as conducting surveillance.

**II.    REASON FOR AFFIDAVIT**

3. This affidavit is made in support of a criminal complaint and arrest warrant charging SIKIRAT ADUNNI BROWN ("BROWN"), also known as "SIKIRAT ADUNNI BADEJO" with violations of 18 U.S.C. § 1347 (Health Care Fraud) and 18 U.S.C. § 1035 (Health Care False Statements).

1

4.     BROWN currently resides in Upper Marlboro, Maryland. Since approximately July 2014 through the present, BROWN has been employed as a Personal Care Aid ("PCA") to provide home health services to residents of the District of Columbia who receive Medicaid. BROWN has used a unique National Provide Identifier ("NPI") Number, ending in 2972, to submit timesheets to Home Health Agencies ("HHAs"), which in turn have billed Medicaid and paid BROWN.

5.     In or around August 2019, the FBI, the Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), and the D.C. Medicaid Fraud Control Unit ("MFCU") opened an investigation into allegations that BROWN was defrauding Medicaid. The investigation confirmed that BROWN caused false claims to be submitted to Medicaid, which can be broadly categorized as follows: (1) claims purporting that BROWN provided services in excess of twenty (20) hours in a given day; (2) claims purporting that BROWN provided services to multiple beneficiaries in overlapping hours for different HHAs; (3) claims purporting that BROWN provided services to Medicaid beneficiaries to whom she provided no care at all; (4) a claim purporting that BROWN provided services while traveling outside the D.C. metropolitan area; and (5) claims that were tainted by the payment of illegal kickbacks to at least one Medicaid beneficiary to secure signatures on fraudulent timesheets.

6.     Based on a review of Medicaid billing claims submitted under BROWN's NPI number for a period of approximately 56 months, between on or about November 1, 2014 through on or about June 28, 2019, Medicaid paid HHAs that employed BROWN approximately $463,229 for approximately 93,879 units (or 23,469.75 hours) of PCA services allegedly provided by BROWN. A review of BROWN's claims data shows that she caused Medicaid to be billed for as many as 164 units (or 41 hours) of work on a single day. The claims data further showed that, at various times between November 2014 and the present, BROWN was employed by approximately

eleven HHAs. The eleven HHAs were registered to do business in the District and in doing so provide home health services to D.C. Medicaid beneficiaries. BROWN purported to provide PCA services for up to thirty-one different Medicaid beneficiaries during this time period.

7. The facts and information contained in this affidavit are based on my personal knowledge of the investigation and the observations and reports of other law enforcement officers. This affidavit does not include every fact and matter observed by me or known to the government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts necessary to establish that probable cause exists.

### III. OVERVIEW OF THE DISTRICT OF COLUMBIA MEDICAID PROGRAM AND HOME HEALTH CARE SERVICES

8. Medicaid is a "health care benefit program" as defined by 18 U.S.C. § 24(b). It was established by Congress under Title XIX of the Social Security Act of 1965 (the "Medicaid Act"). Medicaid was overseen and administered by the Centers of Medicare and Medicaid Services ("CMS"), an agency within HHS. The federal government provides the funding for 70 to 80 percent of Medicaid, and the District provides the remaining funds. Through September 30, 2008, Medicaid was administered by the D.C. Department of Health's Medical Assistance Administration; however, since October 1, 2008, Medicaid has been administered by the Department of Health Care Finance ("DHCF"), which is located in Northwest Washington, D.C.

9. D.C. Medicaid provides health insurance coverage to residents of the District of Columbia whose incomes are below a certain financial threshold as measured against the poverty line. Recipients of medical services covered by Medicaid are referred to as "beneficiaries." In the District of Columbia, a beneficiary is assigned a D.C. identifier ("DCID"), a unique eight-digit number that is used to bill Medicaid for services provided to the beneficiary.

10. In the District of Columbia, HHAs can provide certain services including skilled nursing, home health aide, and personal care services. Personal care services are intended to assist Medicaid beneficiaries in performing the activities of daily living, known as "ADLs." ADLs include the ability to get in and out of bed, bathe, dress, eat, take medication prescribed for self-administration, and engage in toileting.

11. To be eligible to participate in Medicaid, HHAs must agree to abide by all federal and local laws, regulations, and program manuals governing Medicaid reimbursements. To receive reimbursement from Medicaid, HHAs operating in the District of Columbia are required to submit a claim, either electronically or in paper form, to DHCF. As part of the claim, an HHA must provide certain information, such as the name of the Medicaid beneficiary, the date of service, the type of service and corresponding billing code, the amount of time a service was provided, and the amount of money being claimed by the HHA as payment from Medicaid. Medicaid only pays for services that are medically reasonable and necessary, and that are actually provided as claimed.

12. HHAs employ and contract with personal care aides to provide services to Medicaid beneficiaries. Under the Medicaid rules, a PCA must meet certain qualifications, including: (a) being at least 18 years of age; (b) being a citizen of the United States or an alien who is lawfully authorized to work in the United States; (c) completing a home health aide training program that involves at least seventy-five hours of classroom training with at least sixteen hours devoted to supervised practical training; (d) passing a competency evaluation for the services which the PCA is required to perform consistent with the requirements set forth in 42 C.F.R. § 484.36; (e) obtaining certification in cardiopulmonary resuscitation and maintaining such certification annually; (f) demonstrating that the PCA is free from communicable disease as confirmed by an annual PPD Skin Test or documentation from a primary care physician stating that the person is free from communicable disease; and (g) passing a criminal background check. PCAs are issued a

4

unique 10-digit NPI number, which the HHA uses to bill Medicaid for services rendered to a beneficiary based on timesheets submitted by the PCA.

13. To receive personal care services under Medicaid, a beneficiary must obtain a prescription from a doctor, informally known as an "intake." Medicaid only pays for personal care services if the doctor determines after a face-to-face physical examination that the beneficiary has functional limitations in one or more ADLs. DHCF regulations that went into effect in November 2013 clarified that the doctor prescribing the intake must be the beneficiary's primary care physician with whom the beneficiary had a pre-existing doctor-patient relationship.

14. A beneficiary takes the intake to an HHA, which in turn arranges for a registered nurse to perform an initial assessment of the beneficiary's functional status and needs. The nurse drafts a Plan of Care ("POC") for the beneficiary based on the assessment. The POC is required to specify the frequency, duration, and expected outcome of the personal care services and is supposed to be tailored to address the individual needs of the beneficiary.

15. The HHA then assigns a PCA to provide the personal care services set forth in the POC to the beneficiary. Services typically are provided in the beneficiary's home and PCAs must document the provided care on a timesheet that is submitted to the HHA. The timesheet is supposed to reflect accurately the date the PCA provided services, the itemized services rendered, the amount of time spent providing each service, and the location at which the services were provided. Timesheets are supposed to be signed each day by both the PCA and the beneficiary. However, a single timesheet can contain a full week of services. HHAs use the timesheets to determine and justify the hours of services for which the HHA files a reimbursement claim with Medicaid.

16. As outlined in Section 6.3, Interrelationship of Providers, of the D.C. Medicaid MMIS Provider Billing Manual, "Providers are prohibited from referring or soliciting beneficiaries directly or indirectly to other providers for financial consideration. Providers also are prohibited

from soliciting, receiving or offering kickbacks; payments, gifts, bribes, or rebates for purchasing; leasing, ordering, arranging for, recommending purchasing, leasing; ordering for goods, facilities, or items for which payment is made through the D.C. Medicaid Program."

### IV. FACTS SUPPORTING PROBABLE CAUSE

17. As mentioned above, the investigation revealed that BROWN submitted or caused to be submitted false timesheets to several HHAs for payment for PCA services not rendered to beneficiaries. The HHAs subsequently sought and received payments from D.C. Medicaid based on BROWN's fraudulent timesheets, and in turn paid BROWN.

18. During the course of the investigation, law enforcement obtained, inter alia, BROWN's payroll records, HHA employment records, patient files, and D.C. Medicaid billing claims submitted with BROWN's NPI number. Law enforcement also interviewed witnesses and conducted surveillance.

19. BROWN's fraudulent Medicaid claims are too numerous to recite in this Affidavit. However, for purposes of establishing probable cause, the exemplars set forth in Paragraphs 20 through 29 demonstrate, but are not exhaustive of, the fraud BROWN committed against D.C. Medicaid.

#### A. BILLING EXCEEDING 20 HOURS IN A GIVEN DAY AND OVERLAPPING HOURS OF CARE

20. A review of D.C. Medicaid claims data for BROWN revealed that on 335 occasions, from on or about November 1, 2014 through on or about October 25, 2015, BROWN claimed to provide between 20 and 38 hours of PCA services to Medicaid beneficiaries each day. D.C. Medicaid paid HHAs approximately $180,115.70 on BROWN's behalf for the 335 occasions. On each of the days for which BROWN purportedly worked between 20 and 38 hours, BROWN claimed that she provided PCA services to as few as three and as many as seven beneficiaries each

day, and for between three and six HHAs, often during overlapping hours. Medicaid prohibits PCAs from providing services to more than one beneficiary at a time.

21. For example, on June 28, 2015, BROWN purported to provide 144 units (or 36 hours) of PCA services to six beneficiaries associated with five HHAs. Timesheets submitted for BROWN showed that she allegedly provided PCA services to six beneficiaries during overlapping hours on that single day. Table 1 below summarizes the entries from BROWN's timesheets and the corresponding Medicaid data, including a total payment of $679.68 to the five HHAs.

**TABLE 1[1]**

| 6/28/2015 | | | | | | |
|---|---|---|---|---|---|---|
| BENEFICIARY | HHA | TIME IN | TIME OUT | UNITS PAID | HOURS | $ PAID |
| B-4 | HHA-4 | 7:00 | 15:00 | 32 | 8 | $ 151.04 |
| B-5 | HHA-5 | 8:00 | 14:00 | 24 | 6 | $ 113.28 |
| B-7 | HHA-6 | 8:00 | 12:00 | 16 | 4 | $ 75.52 |
| B-3 | HHA-3 | 13:00 | 21:00 | 32 | 8 | $ 151.04 |
| B-1 | HHA-1 | 15:00 | 19:00 | 16 | 4 | $ 75.52 |
| B-6 | HHA-6 | 15:00 | 21:00 | 24 | 6 | $ 113.28 |
| 6 | 5 | | | 144 | 36 | $ 679.68 |

22. As an additional example, from July 27, 2015 through August 2, 2015, BROWN purported to provide PCA services to three to four beneficiaries per day through three to four HHAs. D.C. Medicaid issued payments totaling $3,322.88 to the four HHAs for 704 units (or 176 hours) of care across a total of seven days even though there are only 672 units (or 168 hours) in a seven-day period. Table 2 below summarizes the entries from BROWN's timesheets and the corresponding Medicaid data.

---

[1] BROWN's NPI number also was used to bill Medicaid for $65 related to one unit of "DIRECT SKILLED NURSING SERVICES OF A LICENSED NURSE (LPN OR RN) IN THE HOMEHEALTH OR HOSPICE SETTING" that was allegedly provided on June 28, 2015. Medicaid issued a $65 payment to HHA-1 as a result of that claim.

## TABLE 2

| Day | Date | BENEFICIARY | HHA | TIME IN | TIME OUT | UNITS PAID | HOURS | $ PAID |
|---|---|---|---|---|---|---|---|---|
| MONDAY | 7/27/2015 | | | | | | | |
| | | B-4 | HHA-4 | 7:00 | 15:00 | 32 | 8 | $ 151.04 |
| | | B-5 | HHA-5 | 8:00 | 14:00 | 24 | 6 | $ 113.28 |
| | | B-7 | HHA-6 | 8:00 | 12:00 | 16 | 4 | $ 75.52 |
| | | B-3 | HHA-3 | 13:00 | 21:00 | 32 | 8 | $ 151.04 |
| | | 4 | 4 | | | 104 | 26 | $ 490.88 |
| TUESDAY | 7/28/2015 | | | | | | | |
| | | B-4 | HHA-4 | 7:00 | 15:00 | 32 | 8 | $ 151.04 |
| | | B-5 | HHA-5 | 8:00 | 14:00 | 24 | 6 | $ 113.28 |
| | | B-7 | HHA-6 | 8:00 | 12:00 | 16 | 4 | $ 75.52 |
| | | B-3 | HHA-3 | 13:00 | 21:00 | 32 | 8 | $ 151.04 |
| | | 4 | 4 | | | 104 | 26 | $ 490.88 |
| WEDNESDAY | 7/29/2015 | | | | | | | |
| | | B-4 | HHA-4 | 7:00 | 15:00 | 32 | 8 | $ 151.04 |
| | | B-5 | HHA-5 | 8:00 | 14:00 | 24 | 6 | $ 113.28 |
| | | B-7 | HHA-6 | 8:00 | 12:00 | 16 | 4 | $ 75.52 |
| | | B-3 | HHA-3 | 13:00 | 21:00 | 32 | 8 | $ 151.04 |
| | | 4 | 4 | | | 104 | 26 | $ 490.88 |
| THURSDAY | 7/30/2015 | | | | | | | |
| | | B-4 | HHA-4 | 7:00 | 15:00 | 32 | 8 | $ 151.04 |
| | | B-7 | HHA-6 | 8:00 | 12:00 | 16 | 4 | $ 75.52 |
| | | B-3 | HHA-3 | 13:00 | 21:00 | 32 | 8 | $ 151.04 |
| | | 3 | 3 | | | 80 | 20 | $ 377.60 |
| FRIDAY | 7/31/2015 | | | | | | | |
| | | B-4 | HHA-4 | 7:00 | 15:00 | 32 | 8 | $ 151.04 |
| | | B-5 | HHA-5 | 8:00 | 14:00 | 24 | 6 | $ 113.28 |
| | | B-7 | HHA-6 | 8:00 | 12:00 | 16 | 4 | $ 75.52 |
| | | B-3 | HHA-3 | 13:00 | 21:00 | 32 | 8 | $ 151.04 |
| | | 4 | 4 | | | 104 | 26 | $ 490.88 |
| SATURDAY | 8/1/2015 | | | | | | | |
| | | B-4 | HHA-4 | 7:00 | 15:00 | 32 | 8 | $ 151.04 |
| | | B-5 | HHA-5 | 8:00 | 14:00 | 24 | 6 | $ 113.28 |
| | | B-3 | HHA-3 | 13:00 | 21:00 | 32 | 8 | $ 151.04 |
| | | B-1 | HHA-1 | 15:00 | 19:00 | 16 | 4 | $ 75.52 |
| | | 4 | 4 | | | 104 | 26 | $ 490.88 |
| SUNDAY | 8/2/2015 | | | | | | | |
| | | B-4 | HHA-4 | 7:00 | 15:00 | 32 | 8 | $ 151.04 |
| | | B-5 | HHA-5 | 8:00 | 14:00 | 24 | 6 | $ 113.28 |
| | | B-3 | HHA-3 | 13:00 | 21:00 | 32 | 8 | $ 151.04 |
| | | B-1 | HHA-1 | 15:00 | 19:00 | 16 | 4 | $ 75.52 |
| | | 4 | 4 | | | 104 | 26 | $ 490.88 |
| | WEEK TOTAL | | | | | 704 | 176 | $ 3,322.88 |

**B.     PAYMENT OF KICKBACKS TO BENEFICIARIES**

23.     BROWN also caused D.C. Medicaid to be billed for PCA services that she did not provide and which were tainted by unlawful kickback arrangements with at least one identified beneficiary.

24.     On or about October 4, 2019, law enforcement interviewed B-8, who said BROWN paid him/her $100 every two weeks to sign timesheets for days she did not provide services. B-8 and BROWN had agreed that BROWN would pay him/her $200 every two weeks, but BROWN only paid B-8 $100, ultimately causing B-8 to discontinue their arrangement. BROWN was supposed to provide him/her with PCA services six hours per day, seven days per week. According to D.C. Medicaid claims data, BROWN caused D.C. Medicaid to be billed for services to B-8 from on or about June 9, 2016 through on or about October 13, 2016. As of June 9, 2016, BROWN was already billing for two other beneficiaries, making B-8 her third, full-time client. According to the D.C. Medicaid claims from June 9, 2016 to October 13, 2016, BROWN caused D.C. Medicaid to issue HHA-7 $14,266.84 in payments for PCA services that BROWN allegedly provided to B-8.

**C.     SURVEILLANCE**

25.     Law enforcement conducted surveillance on March 12, 17, and 18, 2020 as part of this investigation. On March 12, 2020, at approximately 2:38 PM, BROWN's automobile was parked outside of B-12's residence in Southeast Washington, D.C. At approximately 3:24 PM, BROWN left B-12's residence and drove to Costco in Northeast Washington. After shopping for approximately thirty minutes, she returned to her car with a cart full of groceries. She drove away from the parking lot at approximately 4:34 PM, at which time law enforcement was unable to maintain visual surveillance of her. According to HHA-8 timesheets, BROWN had claimed to provide PCA services to B-3 every weekday from 4:00 PM to 12:00 AM. At 5:00 PM, law

enforcement did not see BROWN's car parked at her home residence. At 5:32 PM, law enforcement did not see the vehicle parked at B-3's residence. Law enforcement terminated surveillance at B-3's residence at 5:42 PM and at BROWN's residence at 6:30 PM. Medicaid was billed for a total of 64 units (16 hours) of PCA services that BROWN purportedly provided that day to B-12 and B-3, and Medicaid issued payments to the HHAs totaling approximately $341.00. On the HHA-8 timesheet corresponding to services allegedly provided to B-3, BROWN claimed to provide eight hours of services from 4:00 PM to 12:00 AM notwithstanding the fact that law enforcement observed her at Costco between approximately 4:00 PM and 4:30 PM.

26. On March 17, BROWN's car was parked outside B-12's residence at approximately 2:30 PM. BROWN left B-12's residence at approximately 3:06 PM and drove to her own residence. Law enforcement performed spot checks on her vehicle until 6:00 PM when surveillance was terminated. Notably, Medicaid was only billed for 32 units (8 hours) of PCA services for B-12 that day and did not receive any claims related to BROWN performing services for B-3.

27. On March 18, 2020, law enforcement observed BROWN's car parked outside B-12's residence at approximately 2:24 PM. At approximately 3:09 PM, BROWN left B-12's residence and drove to her home in Upper Marlboro, Maryland, where she arrived at approximately 3:57 PM. At approximately 4:46 PM, while outside B-3's residence, law enforcement called B-3. During the phone call with B-3, law enforcement asked him/her if BROWN was there. B-3 said BROWN was there, that she was providing PCA services, and that she provided services daily from 4:00 PM to 12:00 AM. Following that conversation, law enforcement officers knocked on the door of B-3's residence and asked if BROWN was present. B-3 said BROWN was at the store. B-3 was interviewed and said BROWN had not been to B-3's residence to provide PCA services during the COVID-19 outbreak, for approximately two weeks, per B-3's request. B-3 also stated

10

that when BROWN did provide services, B-3 allowed BROWN to leave earlier than 12:00 AM, sometimes around 10:30 PM or 11:00 PM. At approximately 6:10 PM, law enforcement officers observed BROWN enter the parking lot of B-3's residence, get out of her vehicle, and approach the door to B-3's residence. BROWN then turned around, got back into her vehicle, and departed the parking lot at approximately 6:15 PM. BROWN was observed stopping at a CVS, then returning to her own residence by approximately 6:54 PM. BROWN did not claim that she provided services to B-3 on March 18, even though B-3 told law enforcement that BROWN was at her residence providing services on March 18. A review of BROWN's timesheets for the two weeks immediately preceding March 17 and 18 showed her purportedly providing PCA services to B-3 every single weekday from 4:00 PM to 12:00 AM, notwithstanding B-3's assertion that he/she told BROWN not to report due to the COVID-19 pandemic. BROWN's timesheets also showed her purporting to provide PCA services to B-3 from 4:00 PM to 12:00 AM on March 19, 20, 23, 24, 25, 26, 27, 30, 31; April 1, 2, 3, 20, 21, 22, 23, 24, 27, 28, 29, 30; May 1, 4, 5, 6, 7, 8, 11, 12, 13, 14, 15, 18, 19, 20, 21, and 22.

### D.     BILLING FOR SERVICES NOT RENDERED

28.     On October 10, 2019 law enforcement interviewed B-9. B-9 stated to law enforcement officers that at the request of BROWN, B-9 signed blank timesheets for BROWN at the beginning of each week. B-9 said that despite having a plan that required seven days of PCA care, BROWN would show up to B-9's residence only three or four days per week on average. BROWN also asked B-9 to alert her by telephone if a representative from HHA-7 called or appeared inquiring as to BROWN's services so that BROWN could come to B-9's residence. From approximately March 6, 2017, to August 1, 2017, D.C. Medicaid issued payments totaling approximately $10,900 to HHA-7 for PCA services BROWN purported to provide to B-9.

29. The investigation further revealed that BROWN caused Medicaid to be billed for PCA services she allegedly provided while she was traveling outside of the District of Columbia. D.C. Medicaid claims data showed that BROWN caused Medicaid to be billed for 16 units (four hours) of service that she purportedly provided to B-9 on May 19, 2017. In an HHA-7 timesheet, BROWN claimed that she provided PCA services to B-9 from 11:00 AM to 3:00 PM on May 19, 2017. However, American Airlines records show BROWN traveling from Tampa, Florida, to the D.C. metropolitan area during the morning and early afternoon that day. Specifically, BROWN flew from Tampa to Charlotte, North Carolina, on a flight that departed at 10:25 AM and arrived at 12:16 PM. She then flew from Charlotte to Baltimore Washington Airport, departing at 1:14 PM and arriving at 2:32 PM. BROWN also caused Medicaid to be billed for services she purportedly provided to B-3 from 4:00 PM to midnight that same day. Table 3 summarizes the entries from BROWN's timesheets and the corresponding Medicaid data.

**TABLE 3**

| 5/19/2017 | | | | | | |
|---|---|---|---|---|---|---|
| BENEFICIARY | HHA | TIME IN | TIME OUT | UNITS PAID | HOURS | $ PAID |
| B-9 | HHA-7 | 11:00 | 15:00 | 16 | 4 | $ 80.80 |
| B-3 | HHA-8 | 16:00 | 24:00 | 32 | 8 | $ 161.60 |
| 2 | 2 | | | 48 | 12 | $ 242.40 |

E.   **WAGE HISTORY**

30. BROWN's wage history from 2014 through 2019 reveals that she has received disbursements of approximately $319,654 from HHAs. Table 4 provides more information.

TABLE 4

| HOME HEALTH AGENCY | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | TOTAL |
|---|---|---|---|---|---|---|---|
| HHA-7 | | $54 | $14,298 | $17,409 | $30,200 | $16,874 | **$78,834** |
| HHA-8 | | | $10,952 | $20,987 | $21,828 | $14,103 | **$67,869** |
| HHA-4 | $32,627 | $34,886 | | | | | **$67,514** |
| HHA-3 | $17,517 | $25,894 | | | | | **$43,411** |
| HHA-1 | | | | | | | **N/A** |
| HHA-2 | | | $13,524 | | | | **$13,524** |
| HHA-5 | | $15,304 | | | | | **$15,304** |
| HHA-6 | | $12,406 | | | | | **$12,406** |
| HHA-11 | $10,404 | $1,170 | | | | | **$11,574** |
| HHA-10 | $7,562 | | | | | | **$7,562** |
| HHA-9 | | $1,656 | | | | | **$1,656** |
| **Grand Total** | **$68,110** | **$91,371** | **$38,774** | **$38,396** | **$52,027** | **$30,977** | **$319,654** |

F. **CONCLUSION**

31. Based on the foregoing facts and information gathered thus far in the investigation, I submit that there is probable cause that from on or about November 1, 2014 through the present, BROWN committed Health Care Fraud, in violation of 18 U.S.C. § 1347, and Health Care False Statements, in violation of 18 U.S.C. § 1035.

_____
Special Agent Kristina Benoit
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 on June 22, 2020.

_____
Robin M. Meriweather
United States Magistrate Judge